**BURSOR & FISHER, P.A.**
Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: jvenditti@bursor.com

*Attorneys for Plaintiff and the Putative Classes*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER COTTRELL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SEQUOIA BENEFITS & INSURANCE SERVICES LLC and SEQUOIA ONE PEO, LLC,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Christopher Cottrell ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendants Sequoia Benefits & Insurance Services LLC ("Sequoia Benefits") and Sequoia One PEO, LLC ("Sequoia One") (collectively, "Defendants" or "Sequoia"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

## INTRODUCTION

1.      Plaintiff brings this putative class action lawsuit against Sequoia on behalf of himself and all other persons harmed by the Data Breach that Sequoia announced in or around December 2022 (the "Data Breach").  Plaintiff's claims arise from Sequoia's failure to safeguard personally identifying information ("PII") entrusted to it in its role as a human resources, payroll, and benefits management company, or in its role storing and transferring said information. Specifically, this action arises from Sequoia's reliance on an insecure information storage and transfer system that proved readily penetrable to nefarious hackers, resulting in the exposure of sensitive information, including but not limited to the categories of PII discussed below, *see infra*.

2.      Sequoia is a human resources ("HR") and payroll software company that offers a platform to integrate consumer data insights with expert guidance and provides HR, employee compensation, and employee benefits management and administrative services to businesses. Sequoia One is a "professional employer organization" (or "PEO") that provides outsourced HR, benefits management, and payroll services to hundreds of venture-backed companies, and it also offers services for employee onboarding, risk and safety management, and worker training and development.  Sequoia is used by businesses of all sizes, ranging from startups to public companies such as BuzzFeed and Peloton.  Sequoia's other notable clients include Minted LLC, Wix.com Ltd., DropBox Inc., Ted Conferences LLC, and Zoom Video Communications Inc. Sequoia boasts over 1,700 corporate clients, meaning it stores sensitive personal data on millions of employees and their family members.  In 2021, Sequoia realized approximately $184 million in revenue.

3.      On or about December 7, 2022, Sequoia announced the Data Breach in disclosures

to customers that it detected unauthorized access to a cloud storage repository that contained an array of sensitive and personal data related to its customers (the "Data Breach").[1]  According to Sequoia, between September 22, 2022, and October 6, 2022[2], hackers gained access to the cloud system that Sequoia uses to store a wide range of sensitive personal information on its customers' employees and their family members – including names, addresses, dates of birth, employment status, marital status, Social Security numbers, wage data related to benefits, member identification cards, Covid-19 test results, and vaccination cards.  Thus, despite marketing itself as a safe repository for sensitive information, Sequoia failed to take basic precautions designed to keep that information secure.

4.      The Data Breach affected approximately millions of consumers in the United States, including the personal data of individual employees of Defendants' more than 1,700 corporate clients, along with the employees' family members.

5.      In the Data Breach notification letters, Sequoia admits that information in its cloud storage system was accessed by unauthorized individuals.  The particularly sensitive nature of the exposed data, which includes Social Security numbers, driver's license numbers, and medical information, means Plaintiff and Class members have suffered irreparable harm and are subject to an increased risk of identity theft for the foreseeable future.  Indeed, the information taken in the Sequoia Data Breach already is reportedly being used to perpetrate identity theft against class

---

[1] Subsequently, on December 12, 2022, Sequoia reported the Data Breach with the California Attorney General.  *See* https://www.oag.ca.gov/privacy/databreach/list; https://oag.ca.gov/ecrime/databreach/reports/sb24-559929; https://oag.ca.gov/system/files/Sequoia%20-%20Sample%20Notices.pdf.

[2] *See* Wired, *Popular HR and Payroll Company Sequoia Discloses a Data Breach* (Dec. 8, 2022), https://www.wired.com/story/sequoia-hr-data-breach/ (last accessed Dec. 11, 2022) ("'Sequoia said in disclosures to customers at the beginning of the month that it detected unauthorized access to a cloud storage repository that contained an array of sensitive and personal data related to the company's Sequoia One customers. … Sequoia's breached cloud system stored an array of sensitive personal data, including names, addresses, dates of birth, gender, marital status, employment status, Social Security numbers, work email addresses, wage data related to benefits, and member IDs as well as any other ID cards, Covid-19 test results, and vaccine cards that individuals uploaded to the employment system."); *id*. ("'Unauthorized access of information in a cloud storage system occurred between September 22 and October 6, 2022,' the company wrote [in its disclosures]. … [According to open source security researcher Jonathan Leitschuh,] 'With third-parties like Sequoia that others contract with, the end user can't really opt out or change anything about the relationship if they want the job[.] … But you don't know how these companies are defending this data long-term.'").

members.

6.      Plaintiff received notice of the Data Breach in a letter dated December 7, 2022, which is attached hereto as **Exhibit A**.

7.      Defendants owed a duty to Plaintiff and Class members to maintain reasonable and adequate security measures to secure, protect, and safeguard the PII it collected and stored about them.  Defendants breached said duty by failing to implement and maintain reasonable security procedures and practices to protect the PII from unauthorized access and unnecessarily using, storing, and retaining Plaintiff's and Class member's personal information on Sequoia's inadequately protected software.

8.      The Data Breach was the result of Sequoia's failure to implement reasonable policies and procedures to protect the security of the PII it collected as part of its business. Further, Sequoia waited months to provide actual notice of the Data Breach to victims despite knowing that hackers accessed its cloud storage system and accessed sensitive PII.

9.      Defendants knew that critical software was required to protect Plaintiff's and Class members' personal information.[3]  Further, Sequoia prides itself on being trustworthy, asserting that "[a]t Sequoia, mutual trust is the foundation on which we build our relationships," and it knows that consumer trust is closely tied to, among other things, the way it safeguards and stewards the

---

[3] *See supra*; *see also*, *e.g.*, Petros Rotsidis, *The Value of Information and Why Attackers Send Text Messages to Your Phone*, FORWARD, THE SEQUOIA BLOG (Feb. 14, 2022), https://www.sequoia.com/2022/02/the-value-of-information-and-why-attackers-send-text-messages-to-your-phone/ ("Cyber-attacks are on the rise! … We all know data is valuable to organizations, and it directly translates to services and money.  But data is also valuable to the 'bad guys.'"); Mary Beth Downs, *2020 Cyber Risk Landscape – Let's Do A Deep Dive*, FORWARD, THE SEQUOIA BLOG (Jul. 16, 2020), https://www.sequoia.com/2020/07/2020-cyber-risk-landscape-lets-do-a-deep-dive/ ("It will be critical for businesses to understand the security risks and invest in educating themselves as well as hardening critical systems. … Businesses will need to ensure that they have formal and efficient processes in place to comply with such requests in the manner required by the regulations or risk fines and reputation fallout.  In addition, sufficient documentation will be needed to attest to compliance including auditable and iterative procedures for 'data revocation.'  Over the past ten years, there have been massive, high-profile data breaches and abuses of consumer trust[.]"); Mary Beth Downs, *Cyber Liability Insurance – 10 Tips to Consider*, FORWARD, THE SEQUOIA BLOG (Jul. 27, 2020), https://www.sequoia.com/2020/07/cyber-liability-insurance-10-tips-to-consider/; Mary Beth Downs, *Biometric Data Collection – State and Federal Legislative Recap*, FORWARD, THE SEQUOIA BLOG (Aug. 19, 2020), https://www.sequoia.com/2020/08/biometric-data-collection-state-and-federal-legislative-recap/.

---

information it collects, stores, maintains, and/or transfers.[4] Yet, Sequoia knew that the sensitive consumer information uploaded to its proprietary database was susceptible to security risks. Nonetheless, Sequoia continued to store, maintain, and transmit extremely sensitive PII using this insecure software.

10.  Due to Sequoia's inadequate cybersecurity, Plaintiff's and Class members' PII was accessed and disclosed in the Data Breach.

11.  As a result of the Data Breach, Plaintiff's and Class members' PII have been exposed to criminals for misuse.  The injuries that Plaintiff and the Class have suffered and will continue to suffer include, but are not limited to, the following types of harms: theft of personal, medical, and financial information; financial losses caused by misuse of their PII; the loss in value of their PII as a result of the Data Breach; lost time and costs associated with the detection and prevention of identity theft; the loss in the benefits that Defendants were to provide Plaintiff; and lost time and costs associated with spending time to address and mitigate the actual and future consequences of the Data Breach.

12.  Plaintiff brings this action on behalf of himself and all affected consumers whose PII was exposed as a result of the Data Breach.  Plaintiff seeks, for himself and the Class, damages (including actual, compensatory, consequential, statutory, nominal, punitive, and/or any other economic damages in amounts to be determined by the Court and/or jury), injunctive relief, and attorney's fees, litigation expenses, and costs.

13.  For the foregoing reasons, Plaintiff brings this action individually and on behalf of a Nationwide Class and California Subclass of similarly situated individuals against Defendants for: (i) negligence; (ii) negligence per se; (iii) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (iv) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.; (v) unjust enrichment / restitution; and (vi) declaratory judgment.

---

[4] Sequoia Trust Center, *available at* https://www.sequoia.com/trust/#security (last accessed Dec. 19, 2022); *see also* Sequoia, *Privacy Policy* (eff. Sep. 10, 2021), *available at* https://www.sequoia.com/legal/privacy-policy/ [hereinafter "Sequoia Privacy Policy"] (last accessed Dec. 16, 2022).

1

**THE PARTIES**

2

14.     Plaintiff Christopher Cottrell is a natural person and a citizen of California who

3

resides in Apple Valley, California (San Bernardino County).  In or about December 2022,

4

Defendant notified Plaintiff via a letter dated December 7, 2022, that Plaintiff's PII, which was

5

stored and maintained by Sequoia in a "cloud storage system that contained [Plaintiff's] personal

6

information provided in connection with [Sequoia's] services to its clients, including [Plaintiff's]

7

employer," was accessed by unauthorized user(s) as a result of the Data Breach.  Ex. A.

8

Specifically, the unauthorized user(s) accessed, among other things, Plaintiff's "personal

9

information, including demographic information such as your name, address, date of birth, gender,

10

marital status, and employment status, social security number, work email address, member IDs,

11

wage data for benefits, attachments [Plaintiff had] provided for advocate services …, and ID cards

12

and any COVID test results, or vaccine card that [Plaintiff had] uploaded."  *Id*.  As a result of the

13

Data Breach, Plaintiff spent time and effort investigating the Data Breach, monitoring his financial

14

accounts, and searching for fraudulent activity.  Given the highly-sensitive nature of the

15

information stolen, Plaintiff remains at a substantial and imminent risk of future harm.

16

15.     Defendant Sequoia Benefits and Insurance Services, LLC ("Sequoia Benefits") is a

17

California corporation headquartered at 1850 Gateway Drive, Suite 700, San Mateo, CA 94404.

18

Sequoia Benefits offers services, including a software platform that allows businesses to manage

19

employee experience, employee statistics, compensation, and benefits.

20

16.     Defendant Sequoia One PEO, LLC ("Sequoia One") is a California corporation

21

with its principal place of business located at 22 4th Street, 14th Floor, San Francisco, CA 94103.

22

Sequoia One is a corporate affiliate of Sequoia Benefits that manages human resources, payroll,

23

and employee benefits for businesses.

24

17.     Defendants Sequoia Benefits and Insurance Services, LLC and Sequoia One PEO,

25

LLC (collectively, "Defendants" or "Sequoia") are related entities, with Sequoia One PEO

26

specializing in servicing small businesses.  Both Defendants issued breach notification letters

27

following the Data Breach.

28

18.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who has knowingly and willfully aided, abetted, and/or conspired with them in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and there is minimal diversity in that most members of the proposed Class and Subclass are a citizen of a state different from Defendants.

20.     This Court has personal jurisdiction over Defendants because Defendant Sequoia Benefits's San Mateo headquarters and Defendant Sequoia One's San Francisco principal place of business is located are both this District, and the acts and transactions giving rise to this action occurred in this District.  Additionally, this Court has personal jurisdiction over Plaintiff because he resides in California and submits to the jurisdiction of the Court.

21.      Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Defendants' headquarters and principal place of business are located in this District and because a substantial part of the events, omissions, and acts giving rise to Plaintiff's claims herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.      Background On Data Breaches**

22.     A data breach is an incident in which sensitive, protected, or confidential data has potentially been viewed, stolen, or used by an individual unauthorized to do so.[5]

23.     Data breaches are becoming increasingly more common and harmful.  In 2014, 783

---

[5] *See* Digital Guardian, *The History of Data Breaches* (Oct. 24, 2019), https://digitalguardian.com/blog/history-data-breaches.

data breaches were reported, with at least 85.61 million total records exposed.[6]  In 2019, 3,800 data breaches were reported, with at least 4.1 billion total records exposed.[7]  The average cost of a data breach in the United States in 2019 was $8.19 million.[8]

24.     Consumers are harmed in a variety of ways by data breaches.  First, consumers are harmed financially.  According to the IBM and Ponemon Institute's 2019 "Cost of a Data Breach" report, the average cost of a data breach per consumer was $150 per record.[9]  However, other estimates have placed the costs even higher.  The 2013 Norton Report estimated that the average cost per victim of identity theft—a common result of data breaches—was $298 dollars.[10]  And in 2019, Javelin Strategy & Research compiled consumer complaints from the U.S. Federal Trade Commission ("FTC") and indicated that the median out-of-pocket cost to consumers for identity theft was $375.[11]

25.     Identity theft is one of the most problematic harms resulting from a data breach. With access to an individual's PII, criminals can do more than just empty a victim's bank account – they can also commit all manner of fraud, including obtaining a driver's license or official identification card in the victim's name, but with the thief's picture.  In addition, identity thieves may obtain a job, rent a house, or receive medical services in the victim's name.  Identity thieves may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[12]

---

[6] *See id.*

[7] *See* Norton by Symantec, *2019 Data Breaches: 4 Billion Records Breached So Far* (2019), https://us.norton.com/internetsecurity-emerging-threats-2019-data-breaches.html.

[8] *See* Digital Guardian, *What's the Cost of a Data Breach in 2019* (July 30, 2019), *https*://digitalguardian.com/blog/whats-cost-data-breach-2019.

[9] *See id.*

[10] *See* Norton by Symantec, *2013 Norton Report 8* (2013), https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf.

[11] *See* Insurance Information Institute, *Facts + Statistics: Identity Theft and Cybercrime*, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (citing the Javelin report).

[12] *See* U.S. Federal Trade Commission, *Warning Signs of Identity Theft*, https://www.identitytheft.gov/ Warning-Signs-of-Identity-Theft.

26. Consumers are also harmed by the time they spend rectifying the effects of a data breach. A Presidential identity theft report from 2007 states that:

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts, open new ones, and dispute charges with individual creditors.[13]

27. Further, the effects of a data breach on consumers are not temporary. In a report issued by the U.S. Government Accountability Office ("GAO"), the GAO found that "stolen data may be held for up to a year or more before being used to commit identity theft," and "fraudulent use of [stolen information] may continue for years" after the stolen information is posted on the Internet.[14] In fact, consumers suffer 33% of the harm from a data breach after the first year.[15] Thus, consumers can lose <u>years'</u> worth of time dealing with a data breach.

28. The existence of these problems is not always immediately ascertainable. As the GAO Report describes:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen, data has been sold or posted on the web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

29. Consumers are also harmed by the lost value of their data. Personally Identifying Information ("PII") represent important, highly valuable property rights.[16] PII can be easily

---

[13] U.S. Federal Trade Commission, *The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan* (Apr. 2007), https://www.ftc.gov/sites/default/files/documents/reports/combating-identity-theft-strategic-plan/strategicplan.pdf.

[14] *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 694 (7th Cir. 2015) (citing U.S. GOV'T ACCOUNTABILITY OFFICE, GAO–07–737, REPORT TO CONGRESSIONAL REQUESTERS: PERSONAL INFORMATION (2007)).

[15] *See* Larry Ponemon, *What's New in the 2019 Cost of a Data Breach Report*, SECURITY INTELLIGENCE, https://securityintelligence.com/posts/whats-new-in-the-2019-cost-of-a-data-breach-report/.

[16] *See* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4

commodified, allowing the information to be bought and sold.[17]  This information "has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[18]

30.     PII held by companies like Sequoia is highly prized because such files contain multiple pieces of highly sensitive information, including names, addresses, telephone numbers, email addresses, and Social Security numbers, and bank account information, including routing numbers.  Such information is valued at between $1,200 to $1,300 on the black market.[19]  This, according to the Federal Bureau of Investigation's ("FBI") Cyber Division, is the reason such records can be sold by criminals for roughly 50 times higher than the price of a stolen social security or credit card number on its own.[20]

31.     Indeed, in a February 2022 post on Defendants' official blog, Sequoia's Vice President of Security, Petros Rotsidis, explicitly recognized both the increased risk of data breach today and the high value of compromised PII obtained as a result: "**Cyber-attacks are on the rise!** … We all know data is valuable to organizations, and it directly translates to services and money. But data is also valuable to the 'bad guys.'"[21]  As the February 2022 blog post further noted, "[a] 2021 Forbes article explained the value of personal information on the dark web and … observ[ed] that] … [a] full set of data was valued at $1,010."[22]  Mr. Rotsidis further noted that "[o]nline banking logins cost an average of just $40, with full credit card details including associated data

---

(2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[17] *See* Robert Lowes, *Stolen EHR [Electronic Health Records] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), https://www.medscape.com/viewarticle/824192.

[18] Soma, *supra*, *Corporate Privacy Trend*.

[19] Adam Greenberg, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/home/security-news/health-insurance-credentials-fetch-high-prices-in-the-online-black-market/.

[20] Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8,2014), https://www.illuminweb.com/wp-conent/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[21] Petros Rotsidis, *The Value of Information and Why Attackers Send Text Messages to Your Phone*, FORWARD, THE SEQUOIA BLOG (Feb. 14, 2022), https://www.sequoia.com/2022/02/the-value-of-information-and-why-attackers-send-text-messages-to-your-phone/.

[22] *Id.*

costing between $14 and $30" and that "[a] hacked Gmail account [ranges in value] … from $156 to [] $80."[23]

32.      As a result, companies have begun providing an opportunity to consumers to sell this information to advertisers and other third parties.  More and more, consumers have control over who ultimately receives their PII, and when consulted, consumers place a high value on their PII as well as on the privacy of that information.  Researchers have even confirmed that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[24]

33.      Thus, when consumers' PII is disclosed without their consent, consumers are deprived of both the ability to choose what is done with their information as well as the full monetary value of their information.

**B.      Sequoia Compiles Massive Amounts of Consumer Information**

34.      Sequoia's business model involves aggregating data relating to consumers from various sources, compiling that data in a usable format.[25]  Specifically, Sequoia's Privacy Policy

---

[23] *Id.*; *see also id.* ("Dark web markets are overflowing with listings of hacked cryptocurrency trading accounts and wallets such as Coinbase, LocalBitcoins, Kraken, Cex and more.  A US verified LocalBitcoins account costs $350, rising to $610 for Coinbase and $810 for a Kraken account.").

[24] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior:  An Experimental Study*, 22 INFORMATION SYSTEMS RESEARCH 254, 254 (2011), https://www.jstor.org/stable/23015560?seq=1#page_scan_tab_contents.

[25] Sequoia's website specifies that it obtains the above consumer PII from a number of sources, including, *inter alia*, the following: corporate clients, directly from individual consumers, third party systems and/or services used by clients and consumers, Sequoia's products and/or services selected by clients or consumers, activity on Sequoia's websites, health and welfare and retirement service providers, financial planning service providers, recruiting service providers, employment screening service providers, insurance companies, insurance adjusters, timekeeping service providers, and web forms submitted through Sequoia's websites.  Sequoia Privacy Policy, *supra*.

The website further indicates several "business purpose(s) for collecting and sharing [the categories of] personal information [] listed above[,]" including, *inter alia*, the following: delivering services to clients and consumers; research and development; security and fraud prevention; auditing transactions, data processing and/or provision of services; debugging systems and products; sales and marketing for sequoia's products and services to clients; consideration of applications for employment by individuals to Sequoia; meeting compliance and regulatory requirements; handling insurable claims; providing outsourced payroll, HR and benefits services to clients and their employees; providing access to data from third party service providers through Sequoia's mobile phone application; quality assurance; providing customer support, including advocate services to client employees; and managing Sequoia's own employees or providing services to clients that assist them in management activities with respect to client's employees.  *Id.*

notes that Defendants "have collected PI in the past 12 months in [several] categories …, and may continue to collect PI about Consumers, including:"[26]

   (1)     **"Identifiers"** ("includ[ing] but [] not limited to[] a real <u>name</u>, alias, <u>postal address</u>, unique personal identifier, online identifier, Internet Protocol address, email address, account name, <u>social security number</u>, driver's license number or other similar identifiers");

   (2)     **"Personal Records (listed in Cal. Civ. Code § 1798.80(e))"** ("includ[ing] information such as[] physical characteristics or description, signature, telephone number, education, <u>employment</u>, employment history, equity grant and equity compensation data, insurance policy number, bank account number, or any <u>other financial information, medical information, or health insurance information</u>");

   (3)     **"Consumer Characteristics"** ("includ[ing] … sex[ and] marital status");

   (4)     **"Customer Account Details / Commercial Information"** ("includ[ing] but [] not limited to[] … purchasing or consuming histories or tendencies");

   (5)     **"Biometric Information"** ("includ[ing] information that can be used to establish individual identity, such as fingerprints and face scans, from which an identifier template can be extracted, and other physical patterns such as sleep, health, or exercise data, that contain identifying info");

   (6)     **"Internet Usage Information"**;

   (7)     **"Geolocation Data"**;

   (8)     **"Sensory Data"**;

   (9)     **"Professional or Employment Information"** ("includ[ing] but [] not limited to[] professional, educational, or <u>employment-related information</u>"); and

   (10)     **"Inferences from PI Collected**[.]"[27]

---

[26] *Id.* (underlining added for emphasis; bolding in original); *see also id.* ("We may disclose your personally identifiable information to our subsidiaries or affiliates and to third party partners whom we occasionally hire to provide services on our behalf, including support services, website services, delivering promotional materials, answering customer questions about our services and new services.  Sequoia will [] provide those third party partners with the personally identifiable information they need to deliver the services to us and/or on our behalf[.]").

[27] *See also id.* ("**2. Collection of Your Information** … The personally identifiable information that Sequoia collects through these portions of the Service may include your name, username, password, email address, address and telephone number and any other personally identifiable information that you choose to include in your account profile or in your submissions to us. … Such information is maintained by Sequoia or service providers acting on behalf of others."); *id.* ("In addition …, <u>if you are an employee using Sequoia Workplace available through our Services, you may be asked to provide certain information to enable your employer to evaluate whether you may be at risk for COVID-19.  This includes responses you provide to</u>

35.     Sequoia recognizes that the value of its company is inextricably tied to its massive trove of consumer data.[28]

36.     Sequoia now collects, stores, and maintains the personal, medical, and financial information on millions of consumers in the United States, including the individual employees of Defendants' more than 1,700 corporate clients, and their family members.

**C.     Sequoia Purports To Recognize The Importance Of Data Security**

37.     Sequoia was well aware of the likelihood and repercussions of cybersecurity threats, including data breaches, having observed numerous other well-publicized data breaches involving major corporations over the last decade plus.[29]  Furthermore, due to increase in the number of breaches during the COVID-19 pandemic, the risk of data breach has become particularly acute in recent years.  Indeed, "2021 was the highest year on record for breaches – growing 23 percent over the previous all-time high."[30]  As a result, other entities within Sequoia's general industry (*i.e.*, companies that collect and store large amounts of sensitive consumer PII, such as consumer reporting agencies) have generally recognized that, "[w]ith data breaches on the rise, companies need to have plans and resources in place to be prepared, react quickly, and help resolve challenges that present themselves to their business customers, consumers, and partners. Putting an actionable program in place can preserve your business' reputation, as well as prevent

---

questions about symptoms you may have experienced related to COVID-19.  You also may be asked about <u>results of recent COVID-19 tests</u>[.]") (emphasis added); *id*. ("**7. Cookies** … Sequoia uses cookies to gather information about your visits to the Service in order to enhance your experience.  Through this process, we collect your IP address.  A cookie is a small string of information that the website you visit transfers to your computer for identification purposes. Cookies can be used to follow your activity on the Service and that information helps us to understand your preferences and improve your experience with the Service.  Cookies are also used for such activities as remembering your user name and password, if necessary.").

[28] *See, e.g.*, Sequoia Trust Center, Sequoia Privacy Policy, *supra*.

[29] *See, e.g.*, Mary Beth Downs, *2020 Cyber Risk Landscape – Let's Do A Deep Dive*, FORWARD, THE SEQUOIA BLOG (Jul. 16, 2020), https://www.sequoia.com/2020/07/2020-cyber-risk-landscape-lets-do-a-deep-dive/ ("Over the past ten years, there have been massive, high-profile data breaches and abuses of consumer trust (Facebook/Cambridge Analytica, Yahoo, Marriott, Equifax, Target). … 'Those that play 'fast and loose' will see an immediate hit to their brand impact, mounting legal and regulatory costs and their long-term health of their business come into question.  In contrast, those that design their systems to share data responsibly will thrive and soar in value.'")

[30] TransUnion, *Data Breach Services*, https://www.transunion.com/solution/data-breach-services.

1    the loss of customers.  The ability to notify and assist impacted individuals and get back to

2    business as usual could make the difference between solid recovery and grinding to a halt."[31]

3          38.    Sequoia, too, has recognized the important of having systems, plans, and resources

4    in place to prevent data breaches.[32]  Noting that "[o]ver the past ten years, there have been

5    massive, high-profile data breaches and abuses of consumer trust," Sequoia's current Senior Client

6    Service Manager, Mary Beth Downs, has emphasized the importance of businesses bolstering their

7    data security practices.[33]

8          39.    Ms. Downs has further acknowledged that the risk of data breach is higher today

9    than ever.  As she explains, there is a pronounced risk that consumers' PII will be compromised

10   due to data breach, given new technological and societal developments and the associated

11   vulnerabilities commonly plaguing companies' (including Sequoia's) file storage systems.  Some

12   of these vulnerabilities stem from shifting consumer and business practices related to the recent

13   pandemic.  For instance, according to Ms. Downs, "[i]n response to the COVID-19 crisis, many

14   companies [] develop[ed] new biometric technologies to control the spread of the virus," and

15   "[e]ven more employers have begun collecting employee health data, such as recording

16   employees' temperatures or conducting COVID-19 tests on-site."[34]  As a result, in mid-2020, Ms.

17   [31] *Id.*

18   [32] *See, e.g.*, Sequoia Privacy Policy, *supra* ("**3. Protection of Your Information** … To prevent
     unauthorized access or disclosure, maintain data accuracy and facilitate the appropriate use of
19   information, Sequoia uses physical, technological and administrative procedures to attempt to
     protect the personally identifiable information we collect through the Service.  Nevertheless,
20   Internet transmissions are never completely private or secure.  You understand that any messages
     or information you send to the Service may be read or intercepted by others.") (underlining added
21   for emphasis).

22   [33] *See* Mary Beth Downs, *2020 Cyber Risk Landscape – Let's Do A Deep Dive*, Forward, The
     Sequoia Blog (Jul. 16, 2020), https://www.sequoia.com/2020/07/2020-cyber-risk-landscape-lets-
23   do-a-deep-dive/ ("***It will be critical for businesses to understand the security risks and invest in
     educating themselves as well as hardening critical systems***. ... [T]he rising stakes will certainly
24   increase … urgency around cyber risk management at the top levels of business leadership across
     the globe. … ***Businesses will need to ensure that they have formal and efficient processes in
25   place to comply with such requests in the manner required by the regulations or risk fines and
     reputation fallout***.  *In addition, sufficient documentation will be needed to attest to compliance
26   including auditable and iterative procedures for 'data revocation.'*") (italics in original; bolding
     and underlining added for emphasis).

27   [34] Mary Beth Downs, *Biometric Data Collection – State and Federal Legislative Recap*, Forward,
     The Sequoia Blog (Aug. 19, 2020), https://www.sequoia.com/2020/08/biometric-data-collection-
28   state-and-federal-legislative-recap/.

Downs predicted that, "[i]n the coming months, privacy issues regarding the collection, storage and transmission of biometric data will undoubtedly push to the forefront, forcing employers to establish new security protocols."[35]  As noted above, Ms. Downs's prediction came true.[36]

40.     Ms. Downs observation regarding the impact of COVID-19 on data security is particularly apt here, since Sequoia indeed began collecting and storing its corporate clients' employee health data during the pandemic, including, *inter alia*, employees' "responses … to questions about symptoms [individual employees] may have experienced related to COVID-19" and "results of recent COVID-19 tests."[37]  And because Sequoia failed to "employers to establish new security protocols" as Ms. Downs recommended, Plaintiff's compromised PII as a result of the Data Breach includes "COVID test results" and his "vaccine card," as is indicated in the December 7 letter he received earlier this month.  Ex. A.

41.     Unrelated to COVID-19, the increased risk of data breach facing businesses today also stems from failure to establish new security protocols in response to new technological developments.[38]  For example, highlighting "the Impact of 5G," Ms. Downs noted in 2020 that **"[w]ith cloud-hosted platforms and decentralized infrastructure, security professionals [now] have far less visibility into the security stack and how it's managed, forcing companies to rely on the promises made by cloud vendors that their environments are secure, without a way to know if assets are fully protected**."[39]  Significantly, as Defendants stated in their data breach

---

[35] *Id*.

[36] *See* TransUnion, *Data Breach Services*, *supra* ("2021 was the highest year on record for breaches – growing 23 percent over the previous all-time high.").

[37] Sequoia Privacy Policy, *supra* (noting that Sequoia collects and stores "information to enable [a consumer's] employer to evaluate whether [the consumer] may be at risk for COVID-19": "This includes responses you provide to questions about symptoms you may have experienced related to COVID-19. You also may be asked about results of recent COVID-19 tests if your employer has requested that you self-report results."); *see also id*. ("[A]ny information that … we receive about you, including data about your use of the Service and the health-related and COVID-19 testing information described in Section 2, may also be shared with your employer…").

[38] *See* Mary Beth Downs, *2020 Cyber Risk Landscape – Let's Do A Deep Dive*, FORWARD, THE SEQUOIA BLOG (Jul. 16, 2020), https://www.sequoia.com/2020/07/2020-cyber-risk-landscape-lets-do-a-deep-dive/ ("Since 2016, cyber professionals have highlighted … many vulnerabilities[.]").

[39] *Id*. (emphasis added); *see also id*. ("The 5G technology is expected to support a booming class of internet of things (IoT) devices, which could be tremendously beneficial for companies and

notice filed with the California attorney general's office and repeated in Plaintiff's December 7

letter, the Data Breach in this case involved unauthorized access to Sequoia's "cloud storage

system [] contain[ing] personal information" as detailed above.[40]  This indicates that the Data

Breach was an avoidable consequence of Defendants' failure to establish new security protocols to

mitigate the anticipated impact of 5G technologies and perceived risk of data breach associated

with the same.

42.     Ms. Downs has also acknowledged a number of other system vulnerabilities that, if

left unaddressed, raise a high risk of data breach, including but not limited to: "Third-Party

Network Failures"[41]; "Vishing and Deepfakes"[42]; and "New Ransomware Twists."[43]

_____

consumers alike.  However, these devices will likely introduce significant vulnerabilities into the environments in which they are adopted, which could lead to an exponential increase in the number of entry points for malicious actors or points of failure in the event of disruption.").

[40] Tech Crunch, *HR platform Sequoia says hackers accessed customer SSNs and COVID-19 data* (Dec. 12, 2022), https://techcrunch.com/2022/12/12/sequoia-human-resources-hackers/; *see also* Sample Data Breach Notification Letter, https://oag.ca.gov/system/files/Sequoia%20-%20Sample%20Notices.pdf; Ex. A.

[41] Mary Beth Downs, *Cyber Liability Insurance – 10 Tips to Consider*, FORWARD, THE SEQUOIA BLOG (Jul. 27, 2020), https://www.sequoia.com/2020/07/cyber-liability-insurance-10-tips-to-consider/ (discussing "**Third Party Network Failures**": "A company's business operations can be significantly disrupted by a denial-of-service (DoS) attack on a third party's server.  For example, a DoS attack on a third-party DNS server can shut down traffic to many other businesses' sites.") (bolding in original).

[42] Mary Beth Downs, *2020 Cyber Risk Landscape – Let's Do A Deep Dive*, FORWARD, THE SEQUOIA BLOG (Jul. 16, 2020), https://www.sequoia.com/2020/07/2020-cyber-risk-landscape-lets-do-a-deep-dive/ (discussing "**Vishing and Deepfakes**": "Vishing (voicemail phishing) is expected to rise in frequency and can take the form of voice-to-email dissemination, phishing emails with attachments purporting to be voicemail messages, artificial intelligence technology, and voice impersonation schemes.  In another version of vishing, criminals can use commercially available AI software to create realistic impersonations for social engineering schemes. … AI is also used to generate similarly convincing videos, often referred to as 'deepfakes.' … *Businesses should be aware of the potential impact deepfakes could have on security and authentication technology. Experts predict that adversaries will begin to generate deepfakes to bypass facial recognition and other biometric systems.  It will be critical for businesses to understand the security risks and invest in educating themselves as well as hardening critical systems*.") (underlining added for emphasis; italics and bolding in original).

[43] *Id.* (discussing "**New Ransomware Twists**": "Ransomware attacks have also making headlines this past year.  Attacks focused on enterprise operations interruption have become more sophisticated and, in some cases, criminals are pooling their resources to execute more targeted campaigns. … Experts predict the targeted penetration of corporate networks will continue to grow and ultimately give way to what is being called two-stage extortion attacks.  The first stage is the delivery of a ransomware attack and extorting the victim to get their files back.  In the second stage, the criminals target the recovering victim again by threatening to disclose the sensitive data

43.     Moreover, as evidenced by its own product and service offerings, Sequoia has held itself out as a leader and expert in anticipating and combatting threats to the security of the PII and other consumer data that it collects, stores, and maintains on its cloud storage system.  For instance, in the marketing materials of Defendants' website, depicted below, Sequoia emphasizes the importance of "mutual trust," insists that it "takes security seriously and will continue to invest heavily in this area," and assures consumers that "[w]hen it comes to matters of data, technology, and security, [its] approach is based upon investing in best practices, a world class team, and continuous improvement."[44]



**Sequoia Trust Center**

# Coming through for clients

At Sequoia, mutual trust is the foundation on which we build all our relationships. For over 21 years, Sequoia has provided the guidance clients need to care for their people and their business. When it comes to matters of data, technology, and security, our approach is based upon investing in best practices, a world class team, and continuous improvement.

## Components

We extend trust through our service infrastructure and platform, with particular focus on security, compliance and availability.

## Security

Sequoia has invested heavily in security infrastructure and staffing over its 21-year history.

---

that was stolen before the attack to extort even more money.") (underlining added for emphasis; bolding in original).

[44] Sequoia Trust Center, *available at* https://www.sequoia.com/trust/#security (last accessed Dec. 19, 2022); *see also* Sequoia Privacy Policy, *supra* ("**3. Protection of Your Information** … To prevent unauthorized access or disclosure, maintain data accuracy and facilitate the appropriate use of information, Sequoia uses physical, technological and administrative procedures to attempt to protect the personally identifiable information we collect through the Service.  Nevertheless, Internet transmissions are never completely private or secure.  You understand that any messages or information you send to the Service may be read or intercepted by others.") (underlining added for emphasis).



44.    Sequoia has even maintained a dedicated landing page dedicated to its data security practices and its trustworthiness, where it heavily suggests that its systems are specifically tailored to withstand data breach: https://www.sequoia.com/trust/#security (the "Sequoia Trust Center"). As described herein, such claims were simply not true.

**D.    Defendants Collected And Stored Plaintiff's And Class Members' Personally Identifying Information, Promising To Keep It Safe**

45.    As noted above, Defendants collect and store a considerable amount of consumers' PII, as is outlined on its website.[45]  Defendants' website also highlights how they use and disclose consumers' PII.[46]

46.    Despite Defendants' representations detailed above, Sequoia knew that the sensitive personal information stored on its database was vulnerable and otherwise not secure, leaving high risk targets like Plaintiff's and the Class's PII exposed.

47.    As such, Sequoia was aware that PII was at high risk of theft.  Accordingly, Sequoia should have anticipated and taken appropriate and standard measures to protect Plaintiff's and Class member's PII against cyber-security attacks.  However, Sequoia failed to do so, thereby exposing Plaintiff and Class members to the threat of data breach.

48.    Indeed, as noted above, in December 2022, Sequoia reported a data breach with the California Attorney General after information in the company's possession was subject to

---

[45] *See* Sequoia Privacy Policy, *supra*.
[46] *See*, *e.g.*, *id.*; Sequoia Trust Center, *supra*.

unauthorized access was made to its files (the "Data Breach").[47]  As reported by Sequoia, between September 22, 2022, and October 6, 2022, hackers successfully infiltrated the cloud storage system that Sequoia uses to store sensitive personal information on its customers' employees and their dependents.  According to Sequoia, the Data Breach generally resulted in, *inter alia*, the names, addresses, full Social Security numbers, names, addresses, wage and insurance information, driver's licenses, and medical information of certain individuals being compromised (collectively, the "PII").  In Plaintiff's case, the PII accessed in the Data Breach includes his personal, medical, and financial information, "including demographic information such as [his] name, address, date of birth, gender, marital status, and employment status, social security number, work email address, member IDs, wage data for benefits, attachments [Plaintiff had] provided for advocate services …, and ID cards and any COVID test results, or vaccine card that [Plaintiff had] uploaded."  Ex. A.

49.     On or around December 2, 2022, Sequoia began sending data breach notification letters to the individuals whose data was exposed in the breach.

50.     Sequoia has declined to disclose how many individuals' data was compromised in the breach.  But, based on the company's long list of customers, and the scope of information that Sequoia carelessly stored in the cloud, the Data Breach likely affected millions of individuals in the United States, including the employees of Defendants' more than 1,700 corporate clients and their family members.  Plaintiff, who received notice of the Data Breach in a letter dated December 7, 2022, *see* Ex. A, was one such employee.

51.     Sequoia's Data Breach notification letters attempt to downplay the harm caused by the Data Breach, stating that Sequoia conducted a forensic review of the breach and "found no evidence that the unauthorized party misused or distributed data" at this time.[48]  This statement appears to be designed mislead the data breach victims.  Forensic reviews examine the breached company's information systems to determine the scope of the intrusion and what data was taken; they do not typically investigate whether the hackers have misused or distributed the data.  In fact, Sequoia's breach notification letters admit that there was unauthorized access to the PII of

---

[47] *See supra* note 1; *see also* Ex. A.

[48] Wired, *Popular HR and Payroll Company Sequoia Discloses a Data Breach*, *supra*.

Plaintiffs and Class members. Cybercriminals seek access to exactly the kind of PII that Sequoia left exposed precisely because they can use it to commit identity theft and other fraud. That means that the individuals affected by the Data Breach remain at risk that their data will be distributed on the dark web and fraudulently used in the future. The extent of the breach and the level of harm it will incur on the affected individuals is not yet known.

52.     Defendants owed a duty to Plaintiff and Class members to maintain reasonable and adequate security measures to secure, protect, and safeguard the PII they collected and stored about them. Defendants breached said duty by failing to implement and maintain reasonable security procedures and practices to protect the PII from unauthorized access and unnecessarily using, storing, and retaining Plaintiff's and Class member's personal information on Sequoia's inadequately protected file storage system.

53.     Due to Defendants' inadequate cybersecurity, Plaintiff's and Class members' PII was accessed and disclosed in the Data Breach.

**E.     The Data Breach Was Foreseeable And Entirely Avoidable**

54.     Sequoia could have easily prevented the Data Breach. It failed to take adequate and reasonable measures to ensure its computer and cloud storage systems were protected against unauthorized access.

55.     Sequoia was well aware of the need to protect the PII that it collects and maintains. The PII compromised in the Data Breach is a valuable commodity to identity thieves, and Sequoia knew or should have known of the likelihood of attempted cyberattacks. In fact, as noted above, Sequoia's articles on cybersecurity make clear that Sequoia realized the risks of unsecured databases, particularly those hosted in the cloud.

56.     Sequoia also failed to disclose to Plaintiffs and Class members that its systems and security practices were inadequate to reasonably safeguard their sensitive personal information, and then failed to immediately notify them of the data breach.

57.     The Federal Trade Commission has established guidelines for fundamental data security principles and practices for businesses.[49]  Among other things, the guidelines note businesses should encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack the system, and have a response plan ready in the event of a breach.[50]

58.     Sequoia was at all times aware of its obligations under federal and state laws and regulations to protect data entrusted to it.  Despite that awareness, Sequoia's treatment of the PII it stored for Plaintiffs and Class members fell short of satisfying its legal obligations. Among other things, Sequoia failed to encrypt the PII in its possession, and failed to implement and maintain reasonable measures to prevent unauthorized access to that data.  To the extent Sequoia relied on outside vendors for cloud security, it failed to ensure that they were implementing reasonable security controls.

**F.      The Data Breach Harmed Plaintiff and Class Members, and Will Cause Additional Harm**

59.     Individuals who have been victims of data breaches are much more likely to become victims of identity theft than those who have not. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."  17 C.F.R. § 248.201(9).

60.     PII is highly valuable to identity thieves because, as the FTC explained, "[o]nce identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[51]

---

[49] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited December 19, 2022).

[50] *See id.*

[51] http://www.leginfo.ca.gov/pub/15-16/bill/asm/ab_1551-1600/ab_1580_cfa_20160613_144620_sen_comm.html (last visited December 19, 2022).

61.     Social Security numbers are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult to change.  The Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[52]

62.     Therefore, information compromised in this Data Breach is more valuable than the loss of, for example, credit card information in a retailer data breach. There, victims can close credit and debit card accounts, typically for free.  Here, the information compromised—Social Security numbers, names, dates of birth, and addresses—cannot be "closed" and is difficult, if not impossible, to change.

63.     Sequoia is offering victims three years of free identity protection services, but the identity protection services Sequoia is offering are inadequate protection.  In fact, identity thieves often hold onto personal information in order to commit fraud years after such free programs expire.

64.     As a direct and proximate result of Sequoia's wrongful actions, inaction and/or omissions, the resulting Data Breach, and the unauthorized disclosure of Plaintiff's and Class members' PII, Plaintiff and Class members have suffered, and will continue to suffer, ascertainable losses, economic damages, and other injuries, including:

     a.     The compromise, publication, theft, and/or unauthorized use of their PII;

     b.     Lost value of their PII as a result of its theft and unauthorized use;

---

[52] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited December 19, 2022).

c.   Loss of the benefit of the bargain that Sequoia agreed to provide to Plaintiff and Class Members;

d.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e.   Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the data breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; and

f.   Current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of Plaintiffs' and Class members' lives.

65.   In addition to a remedy for economic harm, Plaintiffs and Class members maintain an undeniable interest in ensuring that their PII is secure, remains secure, and is not subject to further misappropriation and theft.

66.   To date, other than providing three years of identity protection services, Sequoia does not appear to be taking any measures to assist Plaintiff and Class members.

## CLASS ALLEGATIONS

67.   *Class Definition*: Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class and Subclass of similarly situated individuals:

(a)   *Nationwide Class.*  Plaintiff seeks to represent a class of similarly situated individuals, defined as all persons in the United States whose PII was exposed in Defendants' December 2022 Data Breach (the "Class" or "Nationwide Class").

(b)   *California Subclass.*  Plaintiff also seeks to represent a subclass of all California residents whose PII was exposed in Defendants' December 2022 Data Breach (the "California Subclass").

68.   Excluded from the Class are: (1) Defendants and their officers, directors, employees, principals, affiliated entities, controlling entities, and other affiliates; (2) the agents,

1   affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such

2   persons or entities described herein; and (3) the Judge(s) assigned to this case and any members of

3   their immediate families.

4         69.    Plaintiff reserves the right to amend the definition of the Class and Subclass if

5   discovery or further investigation reveals that the Class or Subclass should be expanded or

6   otherwise modified.

7         70.    ***Numerosity.***  Members of the Class and Subclass are so numerous that their

8   individual joinder herein is impracticable.  On information and belief, members of the Class and

9   Subclass number in the millions.  The precise number of Class members and their identities are

10   unknown to Plaintiff at this time but may be determined through discovery.  Class members may

11   be notified of the pendency of this action by mail and/or publication through the distribution

12   records of Defendants and third-party retailers and vendors.

13         71.    ***Commonality and Predominance***.  Common questions of law and fact exist as to

14   all Class and Subclass members and predominate over questions affecting only individual Class

15   and Subclass members.  Common legal and factual questions include, but are not limited to: (a)

16   whether Defendants knew or should have known that their systems were vulnerable to

17   unauthorized access; (b) whether Defendants failed to take adequate and reasonable measures to

18   ensure their data systems were protected; (c) whether Defendants failed to take available steps to

19   prevent and stop the breach from happening; (d) whether Defendants owed a legal duty to Plaintiff

20   and Class members to protect their PII; (e) whether Defendants breached any duty to Plaintiff and

21   Class members by failing to exercise due care in protecting their PII; (f) whether Plaintiff and

22   Class members are entitled to actual, statutory, or other forms of damages, and/or other form of

23   monetary relief; (g) whether Plaintiff and Class members are entitled to equitable relief, including,

24   but not limited to, injunctive relief or restitution; and (h) whether Plaintiff and members of the

25   Class and Subclass are entitled to attorneys' fees and costs.

26         72.    ***Typicality.***  The claims of the named Plaintiff are typical of the claims of the Class

27   and Subclass in that Plaintiff and members of the proposed Class and Subclass were subject to the

28   data breach and had their PII accessed by and/or disclosed to unauthorized third parties.

73. **_Adequacy._**  Plaintiff is an adequate representative of the Class and Subclass because Plaintiff has no interests antagonistic to Class and Subclass members' interests, Plaintiff has retained counsel with considerable experience and success in prosecuting complex class actions and consumer protection cases, and Plaintiff and the undersigned counsel intend to prosecute this action vigorously.  The interests of the Class and Subclass members will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

74. **_Declaratory and Injunctive Relief._**  The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.  Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests.  Defendants have acted and/or refused to act on grounds generally applicable to the Class, making injunctive relief or corresponding declaratory relief appropriate.

75. **_Superiority_**.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Each individual Class and Subclass member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.  Thus, the Class and Subclass are readily definable and prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, ensures uniformity of decisions, and permits claims to be handled in an orderly and expeditious manner.

76.     Defendants have acted or failed to act on grounds generally applicable to the Class and Subclass, thereby making appropriate final injunctive relief with respect to the Class and Subclass as a whole.

77.     Without a class action, Defendants will continue a course of action that will result in further damages to Plaintiff and members of the Class and Subclass and will likely retain the benefits of their wrongdoing.

78.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

**COUNT I**
**Negligence**
**(On Behalf Of The Nationwide Class And California Subclass)**

79.     Plaintiff hereby re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

80.     Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class and California Subclass against Defendants.

81.     Sequoia owed a duty to Plaintiff and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting their Personal Information in its possession from being compromised, lost, stolen, accessed and misused by unauthorized persons.  More specifically, this duty included, among other things: (a) designing, maintaining, and testing Sequoia's security systems to ensure that Plaintiff's and Class members' Personal Information in Sequoia's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

82.     Sequoia's duty to use reasonable care arose from several sources, including but not limited to those described below.

a.  Sequoia had common law duty to prevent foreseeable harm to others. This duty existed because Plaintiffs and Class members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiff and Class Members would be harmed by the failure to protect their Personal Information because hackers routinely attempt to steal such information and use it for nefarious purposes, Sequoia knew that it was more likely than not Plaintiff and other Class members would be harmed.

b.  Sequoia's duty also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII by companies such as Sequoia. Various FTC publications and data security breach orders also form the basis of Sequoia's duty.  In addition, individual states have enacted statutes based upon the FTC Act that also created Sequoia's duty.

c.  Sequoia's duty also arose from Sequoia's unique position as an organization that specializes in handling PII.  Sequoia holds itself out as a trusted steward of the PII that it receives, and thereby assumes a duty to reasonably protect that data.  Otherwise, Plaintiff and Class members would be powerless to fully protect their interests with regard to their PII in Sequoia's hands.

d.  Sequoia admits that it has an enormous responsibility to protect consumer data, that it is entrusted with this data, and that it did not live up to its responsibility to protect the Personal Information at issue here.

e.  Sequoia also acknowledges and recognizes a pre-existing duty to exercise reasonable care to safeguard Plaintiff's and Class members' Personal Information that extends to those who are entrusted with such information. Sequoia may now deny that it has any legal duty to protect information relating to the data Sequoia maintains relating to Plaintiff and Class Members.

But when dealing with businesses that purchase consumer information from Sequoia, Sequoia explicitly recognizes and contractually insists that those businesses have a duty to protect this information.

    f.     With regard to network security, Sequoia further acknowledges and requires that its business partners must use commercially reasonable efforts to protect Sequoia information when stored on servers.

    g.     Sequoia's duty also arose under state statutes that required Sequoia to reasonably safeguard sensitive PII of Plaintiff and Class members and to promptly notify them of a breach because of state laws and statutes that require Sequoia to reasonably safeguard sensitive Personal Information, as detailed herein.

83.    Timely notification was required, appropriate and necessary so that, among other things, Plaintiff and Class members could take appropriate measures to freeze or lock their credit profiles, avoid unauthorized charges to their credit or debit card accounts, cancel or change usernames and passwords on compromised accounts, monitor their account information and credit reports for fraudulent activity, contact their banks or other financial institutions that issue their credit or debit cards, obtain credit monitoring services, and take other steps to mitigate or ameliorate the damages caused by Sequoia's misconduct.

84.    Sequoia breached the duties it owed to Plaintiff and Class members described above and was thus negligent by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols, and practices, sufficient to protect the PII of Plaintiffs and Class members; (b) detect the breach while it was ongoing; (c) maintain security systems consistent with industry standards; (d) encrypt the PII in its possession; and (d) disclose that Plaintiff's and the Class members' Personal Information in Sequoia's possession had been or was reasonably believed to have been, stolen or compromised in an adequate and timely notice of the Data Breach to consumers.

85.     Plaintiff and Class members were the foreseeable victims of Sequoia's inadequate data security.  Sequoia knew that a breach of its systems could cause harm to Plaintiff and Class members.

86.     Sequoia's conduct created a foreseeable risk of harm to Plaintiffs and Class members.  Sequoia's conduct included its failure to adequately secure its cloud storage infrastructure to protect the PII of Plaintiffs and Class members.

87.     Sequoia knew or should have known of the inherent risks in collecting and storing massive amounts of PII, the importance of providing adequate data security over that PII, and the frequent cyberattacks on businesses that store sensitive PII like that in Sequoia's possession.

88.     Plaintiff and Class members had no ability to protect their PII once it was in Sequoia's possession and control.  Sequoia was in an exclusive position to protect against the harm suffered by Plaintiff and Class members as a result of the Data Breach.

89.     But for Sequoia's wrongful and negligent breach of its duties owed to Plaintiff and Class members, their PII would not have been compromised in the Data Breach.

90.     There is a temporal and close causal connection between Sequoia's failure to implement adequate data security measures, the Data Breach, and the harms suffered by Plaintiff and Class members.

91.     As a direct and proximate result of Sequoia's negligence, Plaintiff and Class members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.  Plaintiff's and Class members' injuries include, but are not limited to, the following:

- theft of their Personal Information;
- costs associated with requested credit freezes;
- costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;
- costs associated with purchasing credit monitoring and identity theft protection services;
- unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts,

including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

- lowered credit scores resulting from credit inquiries following fraudulent activities;

- costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Sequoia Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

- the imminent and certainly impending injury flowing from potential fraud and identify theft posed by their Personal Information being placed in the hands of criminals;

- damages to and diminution in value of their Personal Information entrusted, directly or indirectly, to Sequoia with the mutual understanding that Sequoia would safeguard Plaintiff's and Class members' data against theft and not allow access and misuse of their data by others;

- loss of the benefit of the bargain that Sequoia agreed to provide to Plaintiff and Class Members;

- lost work time;

- continued risk of exposure to hackers and thieves of their Personal Information, which remains in Sequoia's possession and is subject to further breaches so long as Sequoia fails to undertake appropriate and adequate measures to protect Plaintiff and Class members; and

- for purchasers' of Sequoia's own credit monitoring and identity theft protection products, diminution of the value and/or loss of the benefits of those products.

## COUNT II
### Negligence *Per Se*
### (On Behalf Of The Nationwide Class And California Subclass)

92.     Plaintiff hereby re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

93.     Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class and California Subclass against Defendants.

94.     Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the Federal Trade Commission ("FTC"), the unfair act or practice by companies such as TransUnion of failing to use reasonable measures to protect Personal Information.  Various FTC publications and orders also form the

basis of Sequoia's duty.

95.     Sequoia violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Personal Information and not complying with industry standards.  Sequoia's conduct was particularly unreasonable given the nature and amount of Personal Information it obtained and stored and the foreseeable consequences of a data breach at one of the three major credit bureaus.

96.     Sequoia's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

97.     Class members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

98.     Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against.  Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and the Class.

99.     As a direct and proximate result of Sequoia's negligence, Plaintiff and Class members have been injured as described herein and in Paragraph above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**COUNT III**
**Violations of California's Unfair Competition Law ("UCL"),**
**California Business & Professions Code §§ 17200, *et seq.***
**(On Behalf Of The California Subclass)**

100.    Plaintiff hereby re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

101.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

102.    Sequoia is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

103.    Defendants are subject to California's Unfair Competition Law ("UCL"), Cal. Bus.

& Prof. Code §§ 17200, *et seq*., which allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Cal. Bus. & Prof. Code § 17204.  Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

104.    The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]"  Cal. Bus. & Prof. Code § 17200.

105.    Sequoia violated the UCL by engaging in unlawful, unfair, and deceptive business acts and practices.

106.    Sequoia's "unfair" acts and practices include the following:

  a.    Sequoia failed to implement and maintain reasonable security measures to protect Plaintiff and California Subclass members' Personal Information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Sequoia Data Breach.  Sequoia failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents.  This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiff and the California Subclass, whose Personal Information has been compromised.

  b.    Sequoia's failure to implement and maintain reasonable security measures also was contrary to legislatively-declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures.  These policies are reflected in laws, including the FTC Act (15 U.S.C. § 45), the Gramm-Leach Bliley Act (15 U.S.C. § 6801(a)), and California's Consumer Records Act (Cal. Civ. Code §§ 1798.81.5, *et seq*.).

  c.    Sequoia's failure to implement and maintain reasonable security measures also lead to substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition.  Moreover, because consumers could not know of Sequoia's inadequate security, consumers could not have reasonably avoided the harms that Sequoia caused.

  d.    Sequoia also engaged in unfair business practices by violating Cal. Civ. Code §§ 1798.82 *et seq*., as described below.

107.    Sequoia has engaged in "unlawful" business practices by violating multiple laws, including: California's Consumer Records Act ("CCRA"), Cal. Civ. Code §§ 1798.81.5 (requiring

reasonable data security measures) and 1798.82 (requiring timely breach notification); California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1780, *et seq.* (alleged below); the FTC Act, 15 U.S.C. § 45; and California common law.

108.    Sequoia's unlawful, unfair, and deceptive acts and practices include:

    a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and California Subclass members' Personal Information, which was a direct and proximate cause of the Sequoia Data Breach;

    b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Sequoia Data Breach;

    c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and California Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45 and the CCRA, Cal. Civ. Code §§ 1798.80, *et seq.*, which was a direct and proximate cause of the Sequoia Data Breach;

    d.    Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and California Subclass members' Personal Information, including by implementing and maintaining reasonable security measures;

    e.    Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and California Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45 and the CCRA, Cal. Civ. Code §§ 1798.80, *et seq.*;

    f.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and California Subclass members' Personal Information; and

    g.    Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and California Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the CCRA, Cal. Civ. Code §§ 1798.80, *et seq.*

109.    Sequoia's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Sequoia's data security and ability to protect the confidentiality of consumers' PII.

110.    As a direct and proximate result of Sequoia's unfair, unlawful, and fraudulent acts and practices, Plaintiff and California Subclass members were injured and lost money or property, including the costs passed through to Sequoia from their consumer transactions, the premiums

and/or price received by Sequoia for its goods and services, monetary damages from fraud and identity theft, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their PII.

111.    Sequoia acted intentionally, knowingly, and maliciously to violate California's UCL, and it recklessly disregarded Plaintiff's and California Subclass members' rights.  Sequoia was on notice that its security and privacy protections were inadequate.

112.    Plaintiff and California Subclass members seek all monetary and non-monetary relief allowed by law, including (as alleged below) restitution of all profits stemming from Sequoia's unfair, unlawful, and fraudulent business practices or use of their PII; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

113.    Defendants' violations have continuing and adverse effects because Defendants' unlawful, unfair, and/or fraudulent conduct is continuing and there is no indication that Defendants intend to cease this course of conduct.  The public and the California Subclass members are subject to ongoing harm because the unlawful, unfair, and/or fraudulent business practices associated with the Sequoia Data Breach are still used by Defendants today.

114.    Plaintiff and California Subclass members seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.  Defendants should be required to disgorge all the profits and gains they have reaped and restore such profits and gains to Plaintiff and California Subclass members, from whom monies were unlawfully taken.

115.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and California Subclass members seek a court order enjoining Defendants from such future misconduct, and any other such orders that may be necessary to rectify the unlawful, unfair, and/or fraudulent business practices of Defendants.

116.    Plaintiff brings this action as private attorney generals and to vindicate and enforce an important right affecting the public interest.  Plaintiff and the California Subclass members are therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

1
2
3

**COUNT IV**
**Violations of California's Consumers Legal Remedies Act ("CLRA"),**
**Cal. Civ. Code §§ 1750, *et seq.***
**(On Behalf Of The California Subclass)**

4          117.     Plaintiff hereby re-alleges and incorporates by reference every allegation set forth in

5    the preceding paragraphs as though alleged in this Count.

6          118.     Plaintiff brings this claim individually and on behalf of the members of the

7    proposed California Subclass against Defendants.

8          119.     The Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, is

9    a comprehensive statutory scheme that is to be liberally construed to protect consumers against

10   unfair and deceptive business practices in connection with the conduct of businesses providing

11   goods, property or services to consumers primarily for personal, family, or household use.

12         120.     Defendants are "person[s]" as defined by Civil Code §§ 1761(c) and 1770, and have

13   provided "services" as defined by Civil Code §§ 1761(b) and 1770.

14         121.     Plaintiff and members of the California Subclass are "consumers" within the

15   meaning of Cal. Civil Code §§ 1761(d) and 1770, and have engaged in a "transaction" as defined

16   by Civil Code §§ 1761(e) and 1770.

17         122.     Sequoia's acts and practices were intended to and did result in the sales of products

18   and services to Plaintiff and the California Subclass members in violation of Civil Code § 1770.

19   These actions violated, and continue to violate, the CLRA in at least the following respects:  (a)

20   Defendants' acts and practices constitute representations deceiving that the Products have

21   characteristics, uses, and/or benefits, which they do not have, in violation of Cal. Civil Code §

22   1770(a)(5); (b) Defendants' acts and practices constitute representations that the Products are of a

23   particular standard, quality, or grade, when in fact they are of another, in violation of Cal. Civil

24   Code § 1770(a)(7); and (c) Defendants' acts and practices constitute representations that the

25   subject of a transaction has been supplied in accordance with a previous representation when it has

26   not in violation of Cal. Civil Code § 1770(a)(16).

27
28

123.     Sequoia's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Sequoia's data security and ability to protect the confidentiality of consumers' Personal Information.

124.     Had Sequoia disclosed to Plaintiff and California Subclass members that its data systems were not secure and, thus, vulnerable to attack, Sequoia would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law.  Instead, Sequoia held itself out as a trusted HR and benefits company and was trusted with sensitive and valuable Personal Information regarding millions of consumers, including Plaintiff and the California Subclass.  Sequoia accepted the responsibility of being a steward of data while keeping the inadequate state of its security controls secret from the public. Accordingly, because Sequoia held itself out as having a special role in the financial system with a corresponding duty of trustworthiness and care, Plaintiff and the California Subclass members acted reasonably in relying on Sequoia's misrepresentations and omissions, the truth of which they could not have discovered.

125.     As a direct and proximate result of Sequoia's violations of California Civil Code § 1770, Plaintiff and California Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Personal Information.

126.     Plaintiff, on behalf of herself and all other members the California Subclass, seeks an injunction prohibiting Defendants from continuing their unlawful practices in violation of the CLRA.

## COUNT V
### Unjust Enrichment / Restitution
### (On Behalf of the Nationwide Class And California Subclass)

127.     Plaintiff hereby re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

128.    Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class and California Subclass against Defendants.

129.    To the extent the Court determines it is necessary to do so, this claim is pled in the alternative to the other legal claims alleged in the complaint.

130.    Plaintiff and Class Members have an interest, both equitable and legal, in the Personal Information about them that was conferred upon, collected by, and maintained by Sequoia and that was ultimately stolen in the Sequoia Data Breach.  This Personal Information was conferred on Sequoia in most cases by third-parties but in some instances directly by Plaintiff and/or Class members themselves.

131.    Sequoia was benefitted by the conferral upon it of the Personal Information pertaining to Plaintiff and Class members and by its ability to retain and use that information.  Sequoia understood that it was in fact so benefitted.

132.    Sequoia also understood and appreciated that the PII pertaining to Plaintiff and Class members was private and confidential and its value depended upon Sequoia maintaining the privacy and confidentiality of that Personal Information.

133.    But for Sequoia's willingness and commitment to maintain its privacy and confidentiality, that Personal Information would not have been transferred to and entrusted with Sequoia.  Further, if Sequoia had disclosed that its data security measures were inadequate, Equifax would not have been permitted to continue in operation by regulators, its shareholders, and participants in the marketplace.

134.    As a result of Sequoia's wrongful conduct as alleged in this Complaint (including among things its utter failure to employ adequate data security measures, its continued maintenance and use of the Personal Information belonging to Plaintiff and Class members without having adequate data security measures, and its other conduct facilitating the theft of that Personal Information), Sequoia has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class members.  Among other things, Sequoia continues to and profit from the sale of the PII while its value to Plaintiff and Class members has been diminished.

135.    Sequoia's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and Class members' sensitive PII, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

136.    Under the common law doctrine of unjust enrichment, it is inequitable for Sequoia to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiff and Class members in an unfair and unconscionable manner.  Sequoia's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

137.    The benefit conferred upon, received, and enjoyed by Sequoia was not conferred officiously or gratuitously, and it would be inequitable and unjust for Sequoia to retain the benefit.

138.    Sequoia is therefore liable to Plaintiff and Class members for restitution in the amount of the benefit conferred on Sequoia as a result of its wrongful conduct, including specifically the value to Sequoia of the Personal Information that was stolen in the Sequoia Data Breach and the profits Sequoia is receiving from the use and sale of that information.

**COUNT VI**
**Declaratory Judgment**
**(On Behalf of the Nationwide Class And California Subclass)**

139.    Plaintiff hereby re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

140.    Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class and California Subclass against Defendants.

141.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

142.    An actual controversy has arisen in the wake of the Sequoia Data Breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' Personal Information and whether Sequoia is currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their

Personal Information. Plaintiff alleges that Sequoia's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of their PII and remains at imminent risk that further compromises of their PII will occur in the future.

143. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a. Sequoia continues to owe a legal duty to secure consumers' Personal Information and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes; and

   b. Sequoia continues to breach this legal duty by failing to employ reasonable measures to secure consumers' Personal Information.

144. The Court also should issue corresponding prospective injunctive relief requiring Sequoia to employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

145. If an injunction is not issued, Plaintiff will suffer irreparable injury, and she lacks an adequate legal remedy in the event of another data breach at Sequoia. The risk of another such breach is real, immediate, and substantial. If another breach at Sequoia occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

146. The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Sequoia if an injunction is issued. Among other things, if another massive data breach occurs at Sequoia, Plaintiff will likely be subjected to substantial identify theft and other damage. On the other hand, the cost to Sequoia of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Sequoia has a pre-existing legal obligation to employ such measures.

147. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Sequoia, thus eliminating the additional injuries that would result to Plaintiff and the millions of consumers whose confidential information would be further compromised.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)   For an order certifying the proposed Nationwide Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the proposed Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

(b)   For an order declaring Defendants' conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiff and members of the Class and Subclass on all counts asserted herein;

(d)   For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

(e)   For prejudgment interest on all amounts awarded;

(f)   For an order of restitution and all other forms of equitable monetary relief;

(g)   For injunctive relief as pleaded or as the Court may deem proper;

(h)   For an order awarding Plaintiff and members of the Class and Subclass their reasonable attorneys' fees and reimbursement of litigation expenses and costs of suit; and

(i)   For such other and further relief as the Court may deem proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: December 19, 2022                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  _____ */s/ Julia K. Venditti* _____

Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: jvenditti@bursor.com

*Attorneys for Plaintiff and the Putative Classes*

1

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

2

I, Julia K. Venditti, declare as follows:

3

1.      I am an attorney at law licensed to practice in the State of California and a member

4

of the bar of this Court.  I am an Associate at Bursor & Fisher, P.A., and counsel of record for

5

Plaintiff Christopher Cottrell in this action.  I have personal knowledge of the facts set forth in this

6

declaration and, if called as a witness, I could and would competently testify thereto under oath.

7

2.      The Complaint filed in this action is filed in the proper place for trial under Civil

8

Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred

9

in this District.  Additionally, Defendants Sequoia Benefits & Insurance Services LLC and Sequoia

10

One PEO, LLC are headquartered and maintain their principal place of business in this District –

11

specifically, in San Mateo, California, and San Francisco, California, respectively – and

12

Defendant's unlawful conduct and a substantial portion of the acts, practices, and events that gave

13

rise to Plaintiff's claims occurred in this District.

14

I declare under the penalty of perjury under the laws of the State of California and the

15

United States that the foregoing is true and correct, and that this declaration was executed at

16

Walnut Creek, California, this 19th day of December, 2022.

17

18

_____/s/ Julia K. Venditti_____
Julia K. Venditti

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Return Mail Processing
PO Box 999
Suwanee, GA 30024

December 7, 2022

700 1 161464 *****************AUTO**ALL FOR AADC 923
CHRISTOPHER COTTRELL



Re: Notice of Data Breach

Dear Christopher Cottrell:

Sequoia Benefits & Insurance Services LLC ("Company") recently became aware that an unauthorized party may have accessed a cloud storage system that contained personal information provided in connection with the Company's services to its clients, including your employer.

**What Happened?** As soon as the Company became aware of the situation, a response plan was initiated and a number of immediate actions were completed, including working with outside counsel to initiate a forensic review by Dell Secureworks, a leading global security firm. That forensic review is now complete, which resulted in the following findings:

- No placement of malicious tools or other software such as ransomware was found.
- No evidence of any threat to client or Company networks was found.
- No evidence of compromise of Company endpoints was found.
- No evidence of data being used or distributed has been found to date.
- No evidence of continuing unauthorized activity in Company systems was found.
- Unauthorized access of information in a cloud storage system occurred between September 22 and October 6, 2022.
- The access was "read only," and there is no evidence that the unauthorized party changed any client data.

Further, based on internal investigation, there have been no instances of service interruption for any client or individuals from this situation. Even though the forensic review found no evidence that the unauthorized party misused or distributed data, the Company is notifying clients and individuals and offering three years of identity protection services through Experian to impacted individuals.

**How did Company Respond?** As soon as the Company became aware that an unauthorized party may have accessed a cloud storage system, the Company initiated a response plan and completed a number of actions, including, retaining outside counsel to assist in investigating this matter, activating through counsel Dell Secureworks to conduct a thorough forensic review, and engaging through counsel a separate global consulting firm with cybersecurity expertise to serve as technical advisors to counsel to supplement the security review.

**What Information Was Potentially Involved?** The unauthorized party may have been able to access some of your personal information, including demographic information such as your name, address, date of birth, gender, marital status, and employment status, social security number, work email address, member IDs, wage data for benefits, attachments you may have provided for advocate services (if any), and ID cards and any COVID test results, or vaccine card that you may have uploaded.

Engagement # B081408

escription of **Experian Services.** As mentioned above, there was no evidence of unauthorized use or distribution f personal information; however, the Company is offering complimentary access to Experian IdentityWorks℠ for 6 months.

f you believe there was fraudulent use of your information as a result of this situation and would like to discuss how ou may be able to resolve those issues, please reach out to an Experian agent. Please note that Identity Restoration is vailable to you for 36 months from the date of this letter and does not require any action on your part at this time. he Terms and Conditions for this offer are located at www.ExperianIDWorks.com/restoration.

While identity restoration assistance is immediately available to you, we also encourage you to activate the fraud etection tools available to you through Experian IdentityWorks as a complimentary 36-month membership. This product rovides you with superior identity detection and resolution of identity theft. To start monitoring personal information, lease follow the steps below:

- Ensure that you **enroll by March 7, 2023** (Your code will not work after this date.)
- **Visit** the Experian IdentityWorks website to enroll: https://www.experianidworks.com/plus
- Provide your **activation code**: WKB635QSB
- If asked, please provide engagement # **B081408.**

f you have questions about the product, need assistance with Identity Restoration that arose as a result of this matter or would like an alternative to enrolling in Experian IdentityWorks online, please contact Experian's customer care eam at **844-850-0017** by March 7, 2023. Be prepared to provide the engagement number **B081408** as proof of ligibility for the Identity Restoration services by Experian.

## ADDITIONAL DETAILS REGARDING YOUR 36-MONTH EXPERIAN IDENTITYWORKS MEMBERSHIP

A credit card is not required for enrollment in Experian IdentityWorks. You can contact Experian immediately regarding any fraud issues, and have access to the following features once you enroll in Experian IdentityWorks:

- **Experian credit report at signup:** See what information is associated with your credit file. Daily credit reports are available for online members only.*
- **Credit Monitoring:** Actively monitors Experian file for indicators of fraud.
- **Internet Surveillance:** Technology searches the web, chat rooms & bulletin boards 24/7 to identify trading or selling of your personal information on the Dark Web.
- **Identity Restoration:** Identity Restoration specialists are immediately available to help you address credit and non-credit related fraud.
- **Experian IdentityWorks ExtendCARE™:** You receive the same high-level of Identity Restoration support even after your Experian IdentityWorks membership has expired.
- **$1 Million Identity Theft Insurance**:** Provides coverage for certain costs and unauthorized electronic fund transfers.

**What You Can Do.** To further protect your information, you can take steps to monitor your accounts, obtain your credit reports, or place a fraud alert or security freeze on your credit account. For information on each of these steps, please review **Attachment A.** Depending on your jurisdiction, you may also have additional rights available to you, which you can review in **Attachment B.**

**For More Information.** If you have further questions or concerns, or would like an alternative to enrolling online, please call 844-850-0017 toll-free Monday through Friday from 8 am – 10 pm Central, or Saturday and Sunday from 10 am – 7 pm Central (excluding major U.S. holidays). Be prepared to provide your engagement number **B081408.**

* Offline members will be eligible to call for additional reports quarterly after enrolling.

** The Identity Theft Insurance is underwritten and administered by American Bankers Insurance Company of Florida, an Assurant company. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.